Colonial Fabrics, Inc. v. Commissioner.
Colonial Fabrics, Inc. v. Commissioner
Docket No. 23563.
United States Tax Court
1951 Tax Ct. Memo LEXIS 348; 10 T.C.M. (CCH) 66; T.C.M. (RIA) 51030; January 22, 1951
*348 Mark M. Horblit, Esq., 84 State St., Boston, Mass., for the petitioner. Stephen P. Cadden, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies for 1943 of $3,044.86 in declared value excess profits tax and $64,082.51 in excess profits tax. The deficiencies result in part from respondent's action reducing from $100,000 to $30,000 the cost of merchandise exchanged for 200 shares of petitioner's stock. The result was a corresponding reduction in equity invested capital. Respondent has stipulated that petitioner is entitled to deductions for sales allowances and selling commissions. Other adjustments are not now contested. The case was heard on a stipulation of facts and evidence. Findings of Fact The stipulated facts are hereby found. Petitioner, a New York corporation, filed its returns with the collector for the third district of New York. In 1941 Colonial Drapery and Curtain Corporation, hereinafter called the Curtain Company, was organized as a selling agent of Mount Hope Finishing Co., hereinafter called Mount Hope, which was engaged in *349 "finishing" or "converting" goods into fabrics designed for upholstery. The Curtain Company also directed the purchase for Mount Hope of "grey goods," meaning fabrics in an unfinished condition. Early in 1943 Mount Hope instructed the Curtain Company that it was to limit purchases, and that the materials then on hand were not available for sale, because Mount Hope had decided to close its Dighton-Colonial department which handled goods suitable for drapery and upholstery. In 1943 the Curtain Company's president was Harrison Horblit and its secretary-treasurer and general manager was Frank J. Mann, who owned a small amount of stock. On May 7, 1943, Abbott Merchandising and Finance Company, hereinafter called Abbott, purchased from Mount Hope the Dighton-Colonial department's close-out merchandise for $30,000 cash. Some of the merchandise consisted of discontinued styles. It was a practice in the trade to introduce new styles every week. An itemized inventory as of April 1, 1943, of the merchandise sold by Mount Hope to Abbott was prepared in the office of the Curtain Company by its staff under direction of Mann. The inventory list included 76 items, each assigned a "cost per yard" *350 and showing a total of $100,773.50. Three classes of merchandise were included in the inventory, there being eight items of "grey goods" assigned a total "cost" of $13,946.43; eleven items of "goods in process" aggregating $53,182.07; and 57 items of "finished goods" listed at $33,645. A detailed summary of information relating to the "grey goods" and "goods in process" disclosed on the inventory is as follows: Grey Goods "Cost per yard"
Construction
Yards
(cents)
Total
52 inch 64 X 104 3.20 sateens
12,173 3/4
21.6
$ 2,629.53
37 1/2 inch 64 X 88 4.70 sateens
1,023 1/2
14.1
144.31
37 1/2 inch 64 X 104 4.37 sateens
5,045 1/2
15.5
782.05
39 inch 96 X 160 3.35 sateens
9,950 1/4
23.5
2,338.30
38 1/2 inch 84 X 136 4.25 sateens
997 1/4
20.6
205.43
48 inch 80 X 20 3716 damask
7,570    51.0
3,860.70
48 inch 80 X 20 3726 damask
7,093    56.0
3,972.08
Total
$13,946.43
Goods in Process "Cost per yard"
Construction
Yards
(cents)
Total
37 1/2 inch 64 X 104 4.37 sateens
99,499 1/2
15.09
$15,006.16
38 1/2 inch 84 X 136 4.25 sateens
4,013 1/2
20.6 826.78
38 1/2 inch 84 X 136 4.25 sateens
6,015 3/4
20.2 1,215.12
38 1/2 inch 84 X 136 4.25 sateens
4,000    19.2 768.00
52 inch 64 X 104 3.20 sateens
7,424 3/4
19.9 1,477.53
52 inch 64 X 104 3.20 sateens
40,347 3/4
21.6 8,715.11
52 inch 64 X 104 3.20 sateens
33,278 3/4
21.9 7,288.05
52 inch 40 X 32 1.30 twill
15,605    39.8 6,210.79
52 inch 60 X 48 1.80 sheeting
25,670    30.9 7,932.09
52 inch 60 X 48 1.80 sheeting
12,482    29.8 3,719.64
52 inch "Trial Novelty"
97    23.5 22.80
Total
$53,182.07
*351 The 57 items of "finished goods" were identified in the inventory by 40 different "style numbers," ranging from 381 to 3,950 and referring to various styles, designs and patterns exclusive with Mount Hope's Dighton-Colonial department. According to the inventory, the quantity of "finished goods" of the several style numbers varied from 13 to 9,094 yards; and the "cost per yard" ranged from 15 to 76.65 cents. In addition, the "finished goods" inventory listed 292 1/2 yards of "damaged & etc. & ends" and 94 1/2 yards of "trials" at 30 and 20 cents per yard, respectively. Petitioner was incorporated on April 9, 1943, with authorized capital stock of 1,000 no par value shares of which 500 were preferred and 500 common. Petitioner has engaged since its incorporation in the business of buying, converting and selling drapery and upholstery fabrics. Among petitioner's offices in 1943 were Harrison Horblit, president; Mann, vice president; and Mark M. Horblit (Harrison's father), treasurer. On April 9, 1943, the first meeting of petitioner's board of directors, consisting of the two Horblits, Mann, and others, adopted a resolution "that the shares of preferred stock be issued for cash *352 at fifty ( $50) dollars per share, and that the shares of common stock be issued for cash or property at five hundred ( $500) dollars per share." According to petitioner's records, 62 of its common shares and 180 of its preferred were issued as follows: Date
4-28-43
5-10-43
5-12-43
6-11-43
5-6-43
How Paid In
Cash
Cash
Cash
Cash
Cash and
property
Amount
$3,500
$10,000
$2,500
$9,000
$15,000
Contributor
Mark M.
Mark M.
Mark M.
Alden Corp.
Mark M.
Horblit
Horblit
Horblit
Horblit
Shares Issued
Common
7
20
5
30
Preferred
180
Issued to
Harrison D.
Mark M.
Harrison D.
Alden Corp.
Mark M.
and Clara G.
Horblit
Horblit
Horblit
Horblit
As disclosed by a written instrument dated May 6, 1943, and signed by Mark Horblit, the $15,000 in "cash and property" consisted of the following: 1. A joint and several promissory
note dated January 2, 1941, made
by Colonial Drapery & Curtain
Corporation * * * payable to
Dighton Manufacturing Co. * * *
in the amount of
$10,000.00
2. Accounts receivable accrued to
the Dighton-Colonial Department
of Mount Hope Finishing Com-
pany as per books of Colonial
Drapery & Curtain Corporation
aggregating in net amount ap-
proximately
3,868.98
3. All designs and patterns of said
Dighton - Colonial Department * * * (relating to the finishing
or printing of cloth)
800.00
4. Prepaid items
274.96
5. Cash
56.06
Total
$15,000.00
*353 By a written contract dated April 15, 1943, the Curtain Company agreed to act as petitioner's exclusive agent in the sale of drapery and upholstery fabrics. In a letter to Abbott dated May 28, 1943, in which he described himself as the Curtain Company's treasurer, Mann stated that he had been instrumental in causing petitioner's incorporation "to take the place which Mount Hope recently held in relation to my company." He disclosed that the Curtain Company was petitioner's selling agent, and that he was "frankly * * * very anxious that the new corporation [petitioner] should acquire" the inventory previously purchased by Abbott from Mount Hope. He expressed his opinion that if Abbott would transfer the inventory in exchange for a suggested 150 shares of petitioner's common stock, the "arrangement would be advantageous to you, for I am confident that the new corporation [petitioner] should prosper and that consequently you will, eventually, be able to realize for such shares of stock a much larger amount than you can possibly realize out of this inventory in any other way." Mann explained a need for promptness in terminating the sale as follows: "The suggested sale, if promptly *354 made, will enable my company as selling agent to approach the customers of the Dighton-Colonial department in behalf of the new corporation without delay. That consideration, in itself, is of great importance to it, as well as to my company as selling agent. It is very important that the customers of the Dighton-Colonial Department be promptly approached with some sort of reasonably tangible propositions as to the filling in of their broken lots and depleted assortments, if the great though intangible value of the good-will, established with those customers at immense expense and cost over a period of nearly half a century, is to be preserved. Delay will afford competitors opportunities which may, as you can readily imagine, result in loss of this valuable good-will with those customers." In the same letter Mann stated that he had been "largely instrumental in the selection, styling and merchandising of the inventory," and in connection with its make-up and the particular use which might be found for it that - "The Dighton-Colonial Department was, for a period of some months prior to the final sale to you of this close-out inventory, making efforts to reduce its inventory and did *355 not, during that period, add any substantial amount of new merchandise to the inventory of that department. As you, of course, know, the close-out inventory which you bought consists in large part of the broken lots and incomplete assortments remaining after a considerable period of merchandising. "To the new corporation, however, this close-out inventory would have a use and a value quite substantially greater than it would have to any other converters or dealers since no one is in as good a position as the new corporation to handle and merchandise this inventory to the best advantage. The new corporation has purchased the patterns, designs and rollers for making fabrics of the special styles contained in your inventory, and has also arranged to purchase grey goods of constructions suitable for that purpose. It will thus be in a position to supplement the broken lots and depleted assortments of your inventory. The new corporation could handle the inventory with peculiar advantage by reason of its opportunities to match and fill in shades, patterns and styles for retailers and jobbers with whom the Dighton-Colonial Department dealt and whom we know well. The inventory would thus *356 become part of the merchandise of the only converting business specializing in those particular styles, designs and patterns, and the merchandise would be sold by it not as close-out merchandise but in ordinary course of business at the regular prices per yard. The new corporation would, in addition, benefit by reason of the good-will which it would thus be able to establish with those customers. "There is no doubt in my mind that the peculiar advantages which the new corporation has for handling and merchandising this inventory (including the filling in of the broken lots and assortments, the conversion of a part to forms other than ordinary piece goods, and capable selling of the goods to those retailers and jobbers who have been carrying these particular fabrics over a period of time) should eventually result in substantial profits and benefits." Petitioner's capital stock was not listed on any exchange in 1943 and was not regularly traded in. By a resolution adopted on June 14, 1943, petitioner's board of directors resolved "that the offer to sell and convey to this corporation, for two hundred (200) shares of its common capital stock, the merchandise which was held by Mount *357 Hope Finishing Co. in the Dighton-Colonial Department on April 1, 1943 be, and the same hereby is, accepted; * * *." Pursuant to the above resolution on June 28, 1943, petitioner purchased the merchandise listed in the above inventory from Abbott in exchange for 200 shares of its common stock. As disclosed by invoices, the Curtain Company and petitioner purchased other goods of the same constructions and styles as those included in the inventory in question, as follows: Price per
Invoice
Construction
Yard
Date
Sold to
Sold by
of Goods
Yards
(cents)
Apr. 13
Curtain Co.
Bourne Mills
52inch 64X100 Sateens
4,072
21.18
Apr. 20
Curtain Co.
Bourne Mills
52inch 64X100 Sateens
4,011
21.18
Apr. 27
Curtain Co.
Bourne Mills
52inch 64X100 Sateens
4,029
21.18
May 27
Curtain Co.
Sagamore Mfg. Co.
38 1/2inch 84X136 4.25 Combed Sateen
12,524 3/4
20.39
June 4
Curtain Co.
Sagamore Mfg. Co.
38 1/2inch 84X136 4.25 Combed Sateen
10,035
20.39
June 18
Curtain Co.
Saratoga Victory
37 1/2inch 64X 88 4.70 Sateens
25,075 1/2
14.125
Mills
July 30
Curtain Co.
Saratoga Victory
37 1/2inch 64X 88 4.70 Sateens
14,685 1/4
14.125
Mills
May 21
Petitioner
Neisler Mills
#3726 Hammered Satin Damask - 48inch
305
60.0
May 24
Petitioner
Neisler Mills
#3716 Kenilworth Damask - 48inch
228
55.0
June 28
Petitioner
Neisler Mills
#3726 Hammered Satin Damask - 48inch
101
60.0
June 28
Petitioner
Neisler Mills
#3716 Kenilworth Damask - 48inch
425
55.0
Sept. 13
Petitioner
Neisler Mills
#3726 Hammered Satin Damask - 48inch
85
60.0
Sept. 13
Petitioner
Neisler Mills
#3758 Marlboro Damask - 48inch
50
55.0
*358 The Daily News Record is a newspaper which quotes "Cotton Gray Goods Ceilings" for the textile industry and is regarded in the trade as a reliable source for that information. The following ceilings were quoted in both the editions of June 10 and June 29, 1943: Description of Goods
Quotation (Cents per Yard)
52inch 64X104 3.10 to 3.21 Sateens No. 118
21 3/4
37 1/2inch 64X 88 4.70 Sateens No. 118
14 1/8
37 1/2inch 64X104 4.37 Sateens No. 118
15 3/8
39 1/2inch 96X160 3.35 (combed) Sateens No. 118
23.57
38 1/2inch 84X136 4.25 (combed) Sateens No. 118
20.39
The market prices of fabrics used for upholstery and draperies did not vary during the period June 10 to June 29, 1943. As disclosed by invoices dated between June 30 and August 30, 1943, petitioner sold to stores and jobbers some of the "finished goods" acquired from Abbott as part of the inventory in question. The sales of goods bearing different style numbers varied in quantity from 19 1/2 to 335 yards; and the invoice sales prices compare with the "costs per yard" assigned in the above itemized inventory as of April 1, 1943, as follows: Invoice Sales
Inventory
Style
Price per
"Cost per
Number
Yard (cents)
yard" (cents)
507
79.5
56.7 513
91.5
61.8 515
91.5
62.3 600
97.5
62.2 950
76.5
48.7 951
76.5
50.0 952
76.5
49.4 3716
70  55.0 3741
73.5
45.0 3754
73.5
50.0 3756
86.5
76.65
3756
107.5
76.65
3758
86.5
55.0 3905
42  26.2 3905
43  26.2 3909
32.5
21.5 3910
35.5
22.9 3911
35.5
22.8 *359 In June 1948, Mark Horblit, petitioner's secretary, appeared in the office of the internal revenue agent in charge at New York City at an informal conference held in connection with the inventory in question. No agreement was reached as to the amount includible in petitioner's invested capital. In response to a question asked by an internal revenue agent, Mark Horblit replied that he considered the fair market value of the inventory at the time of sale to be not more than $30,000, and that the inventory was comprised "to the best of my knowledge [of] odds and ends and pieces of a discontinued line." In its income and declared value excess profits tax return for 1943 Abbott did not report the receipt of the 200 shares of petitioner's stock and did not report a profit on the sale of its inventory to petitioner. In its returns for the period April 9 to December 31, 1943, petitioner included in purchases the amount of $100,000 representing the inventory acquired from Abbott, and included the same amount in its equity invested capital. In his notice of deficiency respondent determined - "* * * the principal cause of the tax deficiencies and overassessment proposed herein was the *360 reduction in recognized value of merchandise received in exchange for stock from $100,000. to $30,000.00 with its following adjustment to invested capital. * * * to reduced purchases $70,000.00. This figure represents the difference between $100,000.00 the arbitrarily established value, and $30,000.00 the actual market value, of merchandise received June 28, 1943 from Abbott Merchandising and Financing Company in exchange for 200 shares of taxpayer's common stock." The fair market value of the property transferred by Abbott to petitioner in exchange for 200 shares of stock was $30,000 on the date of exchange. Opinion The single issue upon which the correctness of the deficiencies rests is the fair market value at the time of acquisition by petitioner of a stock of merchandise which it acquired in exchange for its shares. This question has been disposed of by our ultimate finding of fact. We have resolved this issue in accordance with respondent's determination not only because of its presumption of correctness, but also because the record fails to supply convincing evidence that the sale of the identical property for cash a few weeks [1] prior to the transfer to petitioner is *361 not the best evidence of its value on the date in issue. . No satisfactory explanation is advanced why the then owner of this stock of merchandise should have been willing to sell it for less than its fair market value. To the contrary there are contemporaneous indications that as a miscellaneous stock of "odds and ends and pieces of a discontinued line" [2] and "broken lots and depleted assortments" which required someone "to match and fill in shades, patterns and styles" [3] petitioner was in a position to extract the greatest profit from the goods, [4] and no other purchaser could have been expected to pay more than the price which petitioner's predecessor in title actually gave. And the fact that the purchase by petitioner was not for cash but for its shares of stock is itself some indication that petitioner's transferor could not have received the higher price in cash. Certainly it could not have sold it for cash to petitioner. [5]
*362 The record does, to be sure, contain evidence as to some sales and some quotations for some of the types of merchandise in question. But even these figures leave much to be desired with respect to quantities involved, condition of the merchandise, and other contributing circumstances. For example, the sales to petitioner shown in the table contained in our findings of fact were all in comparatively small quantities ranging from 50 to 425 yards. The remaining sales in evidence, while in larger quantities, cover only three of the total of 53 widths, constructions and styles constituting the merchandise acquired. The other source of evidence, quotations in the Daily News Record, are not only stated to be ceiling prices rather than the report of actual sales, but for obvious reasons shed little light on such a purchase of large quantities and broken lots as we have to deal with here. See , affirmed (CCA-4) ; . Nor is the issuance of the stock by petitioner's directors conclusive proof of contemporary fair market value. Whatever weight *363 it might ordinarily be entitled to must be regarded as overcome by the other facts in evidence. ; . We accordingly find nothing in the record to convince us that respondent's determination in this respect was in error. Decision will be entered under Rule 50. Footnotes
1. The merchandise was sold for $30,000 cash on May 7, 1943, and was acquired by petitioner on June 28 of the same year. The testimony shows moreover that between June 10 and June 28 the prices of such fabrics did not vary. ↩
2. Taken from the statement of petitioner's secretary made to a representative of the Commissioner of Internal Revenue. ↩
3. Taken from a letter written by petitioner's vice-president. ↩
4. "To the new corporation [petitioner], however, this close-out inventory would have a use and a value quite substantially greater than it would have to any other converters or dealers since no one is in as good a position as the new corporation to handle and merchandise this inventory to the best advantage." (Taken from the letter referred to in footnote 3, supra.) ↩
5. "The new corporation is not in a position to purchase the inventory from you for cash. It could have purchased it for shares of its capital stock." (Taken from the same letter from petitioner's vice-president.)↩